IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | | |
|---|---|---|
| ECR PROPERTIES, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 3:12-cv-760-MEF |
| | ) | (WO – Do Not Publish) |
| CAMDEN COUNTY DEVELOPMENT,) | | |
| LLC, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Plaintiff ECR Properties, LLC's ("ECR") Motion for Summary Judgment on ECR's breach of contract claim against Defendant Camden County Development, LLC ("Camden") (Doc. #16), and Defendants Camden and Bond Safeguard Insurance Company's ("Bond Safeguard") Motion for Summary Judgment (Doc. #48) as to all of ECR's claims against them.  The case arises out of a joint venture between ECR and Camden to create a separate company for the purpose of developing real estate in Russell County, Alabama.  ECR initiated this action in the Circuit Court of Russell County, Alabama on August 1, 2012, and asserts claims for breach of contract (Count I), promissory fraud (Count II), fraud (Count III), unjust enrichment (Count IV), and civil conspiracy and fraud (Count V) against Defendants Camden and Bond Safeguard (collectively, "Defendants") (Doc. #1-1).  Defendants timely removed the action to this Court on August 31, 2012 (Doc. #1).  Camden answered and asserted a counterclaim for breach of contract against ECR (Doc.

1

#6).[1]  ECR has moved for summary judgment on its breach of contract claim against Camden and Bond Safeguard (Doc. #16).  Camden and Bond Safeguard have moved for summary judgment on all claims asserted against them by ECR (Doc. #48).[2]  For the reasons discussed below, ECR's motion is GRANTED and Defendant Camden and Bond Safeguard's motion is GRANTED IN PART and DENIED IN PART.

## I. JURISDICTION AND VENUE

This Court has subject-matter jurisdiction over the parties' claims under 28 U.S.C. § 1332.  The parties do not dispute that venue is proper under 28 U.S.C. § 1391(b), and the Court finds adequate allegations supporting both.

## II. LEGAL STANDARD

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine [dispute] as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party asking for summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and

---

[1] Camden has not moved for summary judgment on its breach of contract counterclaim against ECR, and that claim remains pending in this action.

[2] Due to an unresolved discovery dispute between the parties concerning the production of certain documents that may affect all but the breach of contract claims in this matter, (Docs. #34, 39), the Court ordered the parties not to brief Camden and Bond Safeguard's motion for summary judgment on the remaining counts.  (Doc. #52.) Consequently, the Court will address only the cross-motions for summary judgment on ECR's pending breach of contract claim in this opinion.

identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine dispute of material fact." *Id.* at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing the non-moving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *Id.* at 322–23.

Once the moving party has met its burden, the non-moving party must "go beyond the pleadings and by their own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate 'specific facts showing that there is a genuine issue for trial'." *Id.* at 324 (internal quotations omitted). To avoid summary judgment, the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). A plaintiff must present evidence demonstrating that it can establish the basic elements of its claim, *Celotex*, 477 U.S. at 322, because "conclusory allegations without specific supporting facts have no probative value" at the summary judgment stage. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985).

A court ruling on a motion for summary judgment must believe the evidence of the non-movant and must draw all justifiable inferences from the evidence in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). After the non-moving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine dispute of material fact and the moving party is

3

entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56(a).

## III. FACTS

The Court has carefully considered the submissions of the parties in support of and in opposition to the motion. The submissions of the parties establish the following material facts:

On November 17, 2010, ECR, a Georgia corporation, entered into an Operating Agreement with Defendant Camden, a Florida corporation, to form a third entity known as Rivers Reach Development Company, LLC ("Rivers").  Rivers was incorporated in Alabama for the purpose of developing a subdivision in Russell County, Alabama.  Bond Safeguard had previously issued four subdivision performance bonds on various phases of the properties that would eventually become Rivers.  (Doc. #50-1, at ¶ 4.)

Under the terms of the Operating Agreement, ECR was to make a $700,000 initial capital contribution to Rivers, and Camden would in exchange transfer title to Rivers of the lots constituting Phase 3 of the Rivers Reach subdivision, boat slips, and other property constituting the common or "amenities areas" of the community.  The terms of the Operating Agreement relating to the capital contributions are as follows:

> ***4.1 Capital Contributions***.  At the times provided in this Section 4.1 (until then Camden shall retain ownership of the Property), Camden shall convey to [Rivers] good and marketable title to each of the lots, amenity areas and pocket parts described on Exhibit B . . . and the Boat Slips . . . By execution of this Agreement, each of the Members is hereby obligated to make capital contributions to [Rivers] at such times and of such cash or property described as follows:

> *(a)* Phase 3 Contributions.   Upon execution of this
> Agreement, [ECR] shall transfer to [Rivers] an amount of cash
> equal to $700,000.  The funds so transferred shall be used by
> [Rivers] only for the purposes of paying (within the limits
> shown) the marketing and development expenses described on
> Exhibit C . . . At the time [ECR] transfers the foregoing cash,
> [Rivers] shall commence the work set forth on Exhibit C for
> Phase 3, and Camden shall contribute to [Rivers] the Lots in
> Phase 3, and all of the Amenity Areas and pocket parts at the
> agreed value of $700,000.  Unless the Members unanimously
> agree otherwise, the Amenity Areas and pocket parks [sic] shall
> be held by [Rivers] for use as such for the benefit of all the
> Property.

(Doc. #20-1, Ex. A, at 7–8.)  After their initial capital contributions, ECR and Camden were to each hold a 50% interest in Rivers.  (Doc. #20-1, Ex. A, at 10.)  ECR was solely responsible for the development and marketing of Phase 3.  Any funds needed for developing and marketing Phase 3 in excess of ECR's initial $700,000 contribution were to be contributed solely by ECR.  (Doc. #20-1, at 10.)  If Camden notified ECR of the amount needed to develop and to market Phase 3 in excess of the $700,000 contribution, then ECR had 20 days to make the excess contribution.  If ECR failed to contribute the excess amount, then Camden had the option of contributing the shortfall and subsequently increasing its percentage interest in Rivers by a fixed amount.  (Doc. #20-1, at 10–11.)

After the Operating Agreement was signed on November 17, 2010, ECR transferred $700,000 to Rivers on November 18, 2010.  (Doc. #37-1, Ex. A, ¶ 5; Doc. #17-1, at 5.)  The next day, on November 19, 2010, Tommy Gaither ("Gaither"), counsel for Rivers, sent an e-mail to Jeremy Sentman ("Sentman"), representative for Camden, asking Sentman to send Gaithers information regarding a foreclosure deed so that Gaither could include it in a draft

of the deed transferring the property referred to in the Operating Agreement from Camden to Rivers.  (Doc. #26-3, Ex. C, at 3; Doc. #37-1, Ex. A, at ¶ 5.)  Sentman supplied the missing information to Gaither in an e-mail on December 2, 2010, and also stated that he, rather than Gaither, was preparing a deed for the transfer of property from Camden to Rivers. (Doc. #26, Ex. C, at 5–6; Doc. #26-13, Ex. M, at ¶ 4.)  On January 20, 2011, Gaither prepared a deed himself and forwarded it to Sentman.  (Doc. #37-1, Ex. A, at ¶ 6; Doc. #26-3, Ex. C, at 7.)  ECR did not receive either an executed deed or a draft of a deed from Camden as a result of this exchange.  (Doc. #37-1, Ex. A, at ¶ 6; Doc. #26-13, Ex. M, at ¶ 4.)

Later, in 2011, ECR again brought Camden's failure to transfer the property to Rivers to Sentman's attention.  In mid 2011, ECR obtained bids for construction of required acceleration/deceleration lanes ("accel/decel lanes") at the entrance to the Rivers Reach subdivision but could not obtain the necessary approval to construct them from the Alabama Department of Transportation.  (Doc. #37-1, at ¶ 11.)  The Department of Transportation would not give its approval until a performance bond was issued in the name of Rivers, but Rivers did not yet own the property due to Camden's failure to transfer.  (Doc. #37-1, Ex. A, at ¶ 11.)  Doug Coats ("Coats"), one of the three members of ECR, contacted Sentman about the necessity of getting a performance bond in Rivers's name on September 20, 2011. (Doc. #26-12, Ex. L.)  On October 13, 2011, Coats again e-mailed Sentman and stated, "I really need to talk with you about the deed from Camden to Rivers Reach and the ALDOT Bond and application."  (Doc. #26-2, at 2.)  Sentman responded the same day with the reply,

"Already in the works."  (Doc. #26-2, at 2.)  On October 19, 2011, Gaither again e-mailed a draft of a deed to Sentman for execution and requested that the executed deed be returned to Gaither for recording in Russell County.  (Doc. #25, Ex. A.)  Camden never deeded the property to Rivers as a result of this exchange.

On December 20, 2011, Bruce Maas ("Maas"), attorney for Camden, sent a letter on behalf of Camden to ECR seeking reimbursement for 50% of the expenses incurred for spending on the subdivision that was unrelated to Phase 3.  (Doc. #20-7, Ex. G.)  The Operating Agreement required each member to pay for operating expenses, other than those relating to Phase 3, in accordance with their percentage interests if the majority members determined that additional capital was required for development of Rivers Reach.  (Doc. #20-1, at 10.)  ECR responded that they would not reimburse the expenses until they received invoices detailing the expenses and that they were not required to reimburse the expenses because there had been no determination by the majority members that the extra expenses were warranted.  (Doc. #20-8, Ex. H.)  ECR also claimed it had spent $63,392 of its $700,000 initial contribution on non-Phase 3 expenses and expected this contribution to offset any other obligations ECR might have towards the joint venture.  Camden rejected the claim that ECR could offset other obligations with its spending on non-Phase 3 expenses, and, in a letter dated February 28, 2012, Camden stated it had paid the additional expenses required and reduced ECR's percentage interest in Rivers and increased Camden's percentage interest under the terms of the Operating Agreement.  (Doc. #26-6, Ex. F.)

ECR wrote back in a letter dated March 2, 2012, that ECR refused to make additional

contributions until it received invoices for the additional expenses Camden claimed Rivers had incurred, and that Camden was in breach of the Operating Agreement because it still had not deeded the Phase 3 property to Rivers.  (Doc. #26-4, Ex. D.)  At the time this letter was written, ECR's membership had been entirely replaced as the result of the original members' default on certain promissory notes and the subsequent private sale and assignment of the original members' interest in ECR to investors.  (Doc. #56-2.)  According to the March 2, 2012 letter, Camden's failure to deed the property to Rivers was also referenced in an e-mail from ECR to Camden on January 9, 2012.  Camden again responded by claiming an increased percentage interest in Rivers due to ECR failing to pay back the money it spent on non-Phase 3 expenses.  (Doc. #26-8, Ex. H.)

Finally, in a letter dated Apil 30, 2012, ECR reasserted its position that it had fully performed with respect to its $700,000 initial contribution and that Camden had still failed to deed the property to Rivers and to provide invoices for the $25,000 in additional expenses Camden sought to split with ECR.  (Doc. #26-9, Ex. I.)  In November 2012, ECR ceased development on Rivers Reach, in part, as a result of Camden's failure to deed the property to Rivers.  (Doc. #37-1, at ¶ 13.)

Camden still has not transferred any real property or boat slips to Rivers.  (Doc. #17-1, Ex. A.)  ECR subsequently commenced this action in the Circuit Court of Russell County, Alabama on August 1, 2012, and it was removed to this Court on August 31, 2012.

## IV. DISCUSSION

### A.    Cross-Motions for Summary Judgment on ECR's Breach of Contract Claim

8

All parties have moved for summary judgment on ECR's breach of contract claim against Camden and Bond Safeguard. (Docs. #16, 48.)  The elements of a breach-of-contract claim under Alabama law are: (1) a valid contract binding on the parties; (2) the plaintiff's performance under the contract; (3) the defendant's nonperformance; and (4) resulting damages.  *Barrett v. Radjabi-Mougadam*, 39 So. 3d 95, 98 (Ala. 2009) (quotations and citations omitted).  ECR argues that it performed its obligations under the Operating Agreement by transferring $700,000 to Rivers and that Camden has breached the Operating Agreement by refusing to transfer the relevant property to Rivers.  (Doc. #17.)  Camden does not dispute that a valid contract binding on the parties existed, that ECR contributed $700,000 to Rivers, and that Camden has not transferred the relevant property to Rivers.  (Doc. #21.)  Rather, Camden argues that ECR is not entitled to summary judgment on its breach of contract claim because ECR materially breached the Operating Agreement, ECR waived Camden's contractual obligation to transfer the property within a reasonable time after ECR transferred the $700,000, and that ECR incurred no damages as a result of Camden's failure to transfer the property to Rivers.  (Doc. #21.)  Camden, on the other hand, argues that it is entitled to summary judgment on ECR's breach of contract claim because ECR lacks standing to assert this claim because it should have been brought derivatively on behalf of Rivers, and the change in ECR's membership deprives ECR of standing to sue on the basis of an agreement entered into by previous members of ECR.  (Doc. #49.)

The Operating Agreement states unambiguously that Camden is to transfer the property to Rivers upon ECR's transfer of $700,000 to Rivers.  Section 4.1 states: "*At the*

9

*times provided in this Section 4.1* (*until then* Camden shall retain ownership of the Property),

Camden shall convey" the relevant property to Rivers and that "[b]y execution of this

Agreement, each of the Members is hereby obligated to make capital contributions to

[Rivers] *at such times* and of such cash or property described as follows . . . ." (Doc. #20-1,

Ex. A, at 7) (emphasis added).  Section 4.1(a) states that ECR shall transfer $700,000 to

Rivers "[u]pon execution of this Agreement" and that "[*a*]*t the time* [ECR] *transfers the*

*foregoing cash* . . . Camden shall contribute to [Rivers] the Lots in Phase 3, and all of the

Amenity Areas and pocket parts at the agreed value of $700,000." (Doc. #20-1, Ex. A, at 8)

(emphasis added).  In sum, the Operating Agreement is unambiguous in its requirement that

Camden transfer the property to Rivers at the time ECR made the $700,000 contribution.

The conclusion that the Operating Agreement required Camden to transfer the

property immediately or shortly after ECR's initial cash contribution is reinforced by Section

4.2, which states that, "[u]pon making the initial capital contributions" set forth in the

sections just quoted, each member of the joint venture was to acquire a 50% interest in

Rivers.  (Doc. #20-1, at 10.)  In other words, each party was to transfer something of value

into the Rivers joint venture and, in return, acquire a 50% interest in Rivers.  The transfer of

the property by Camden to Rivers was intended under the terms of the Operating Agreement

to serve as security for ECR's $700,000 cash contribution.  *See N&L Enters., LLC v. Lioce*

*Props., LLP*, 51 So. 3d 273, 279–80 (Ala. 2010) ("It is well settled that a court in seeking to

ascertain the intention of the parties in construing a contract, will consider the contract as a

whole, although the immediate object of the inquiry is the meaning of a particular clause.

10

Further, a contract must be construed as a whole and, whenever possible, effect must be given to all its parts.") (quotation and citations omitted). Because the Operating Agreement is clear that ECR and Camden were to receive their 50% ownership interests in Rivers only after they *each* made an *initial* capital contribution, Camden had a duty to transfer the property at the beginning of the joint venture shortly after ECR made its $700,000 contribution.

It is undisputed that ECR transferred $700,000 to Rivers the day after the Operating Agreement was executed. It is also undisputed that Camden has not transferred any of the relevant property to Rivers. (Doc. #17-1, Ex. A.) Since Camden's duty to transfer the property upon ECR making its initial $700,000 contribution is unambiguously established by the Operating Agreement, and since it is undisputed that Camden has failed to transfer the property, ECR has met its prima facie burden on its breach of contract claim.

Camden does not dispute the meaning of the Operating Agreement or its own failure to transfer the property to Rivers. Rather, Camden argues that there are genuine disputes of fact as to whether: (1) ECR materially breached the Operating Agreement and thus fails to establish its own performance; (2) ECR waived Camden's contractual obligation to transfer the property within a reasonable time after ECR transferred the $700,000; and (3) ECR incurred damages as a result of Camden's failure to transfer the property to Rivers. The Court finds no merit in these arguments.

1.    **ECR's Performance**

To establish its own performance for purposes of a breach of contract claim, a plaintiff

need not show full performance but only substantial performance.  *See Miles v. Moore*, 79

So. 2d 432, 435 (Ala. 1955); *see also Bentley Sys., Inc. v. Intergraph Corp.*, 922 So. 2d 61,

90, 93 (Ala. 2005).   "Substantial performance does not contemplate a full or exact

performance of every slight or unimportant detail, but performance of all important parts."

*Miles*, 79 So. 2d at 435.  If a plaintiff substantially performs, "immaterial deviations will not

prevent recovery of the contract price, less the amount required to indemnify for injuries

sustained by such deviations."  *Huffman-East Dev. Corp. v. Summers Elec. Supply Co.*, 263

So. 2d 677, 680 (Ala. 1972).   In order to create a genuine dispute concerning ECR's

substantial performance, Camden must show that any breach of the Operating Agreement by

ECR was a material breach.  *See Harrison v. Family Home Builders, LLC*, 84 So. 3d 879,

889 (Ala. Civ. App. 2011) ("Substantial performance is the antithesis of material breach.  If

a breach is material, it follows that substantial performance has not been rendered.") (quoting

John D. Calamari & Joseph M. Perillo, The Law of Contracts § 11.8(b) (4th ed. 1998)).

Camden argues that ECR materially breached the Operating Agreement by failing to

secure any buyers for the Rivers Reach development.  (Doc. #21, at 8.)  This argument

misses the mark because the Operating Agreement does not condition Camden's duty to

transfer the property on ECR selling lots, and the undisputed evidence does not establish a

material breach by ECR.  The Operating Agreement requires ECR to spend its initial

$700,000 contribution on developing and marketing Phase 3 of Rivers and to contribute any

additional cost of developing and marketing Phase 3 in excess of $700,000.  (Doc. #20-1, at

8, 10.)   ECR spent $500,000 of its $700,000 contribution on physical infrastructure

12

improvements to Phase 3 of Rivers Reach.  (Doc. #37-1, Ex. A, at ¶¶ 9–10.)  In addition, ECR succeeded in attracting potential buyers to the development, but the fact that none of the sales were ever finalized does not mean that ECR breached its duty to market the property.  (Doc. #25, Ex. C, at ¶ 12; Doc. #37-1, Ex. A, ¶ 12.)  Camden's own brief admits that ECR marketed Phase 3 and that ECR's failure to obtain final sales were due to forces beyond its control.  (Doc. #21, at 8.)  Camden has not raised a genuine dispute of fact as to whether ECR materially breached the Operating Agreement because ECR had no duty to secure buyers for the Rivers Reach development, but only a duty to market and to develop Phase 3, a duty that it fulfilled.

Camden next argues that ECR materially breached the Operating Agreement by refusing to contribute non-Phase 3 expenses to Rivers and by using some of its $700,000 initial contribution for non-Phase 3 expenses.  The Operating Agreement required each member to pay for non-Phase 3 expenses in accordance with their percentage interests if the majority members determined that additional capital was required for development of Rivers Reach.  (Doc. #20-1, at 10.)  When Camden demanded that ECR pay its half of $25,000 in non-Phase 3 expenses, ECR refused to reimburse Camden until it received invoices establishing that ECR was obligated to pay the expenses and claimed that Camden could not unilaterally require it to pay the expenses since "Majority Members" of Rivers had to agree to pay the additional expenses under Section 4.3(b) of the Operating Agreement.  (Doc. #20-8, Exs. G, H.)  Camden never provided invoices to ECR verifying that the expenses were "Additional Capital Contributions" under Section 4.3(b) of the Operating Agreement.  (Doc.

13

#26-4, Ex. D; Doc. #26-9, Ex. I.)  In addition, Camden states that, in ECR's response, ECR

also admitted it spent $63,392 of its $700,000 contribution for non-Phase 3 expenses.  The

Operating Agreement requires ECR to use its initial contribution for Phase 3 expenses only.

(Doc. #20-1, at 8.)  The Court finds that neither of these actions by ECR is a material breach

that excuses Camden from transferring the relevant property to Rivers as required by the

Operating Agreement.

First, ECR's refusal to contribute $12,500 in non-Phase 3 expenses in light of

Camden's refusal to provide invoices detailing the nature of the expenses may not even be

a breach at all, but if it were, ECR's refusal is not a *material* breach of the Operating

Agreement.  *See Sokol v. Bruno's, Inc.*, 527 So. 2d 1245, 1248 (Ala. 1988) ("A material

breach [of a contract] is one that touches the fundamental purposes of the contract and

defeats the object of the parties in making the contract.").  ECR refusing to pay until Camden

verified the nature of the expenses does not touch the fundamental purposes of the Operating

Agreement or defeat the object of the parties in making it.

Second, ECR's use of $63,392 in funds from its $700,000 contribution for non-Phase

3 expenses is not a material breach of the Operating Agreement as a matter of law.  As *Sokol*

states, a material breach must touch the fundamental purposes of the contract and defeat the

object of the parties in making it.  A minor deviation by ECR of its performance under the

Operating Agreement is grounds for an offset to its damages by Camden, but it is not an

excuse for Camden's nonperformance.  A reasonable juror could not conclude that Camden's

complete failure to transfer the relevant property to Rivers was excused because ECR spent

14

$63,392 of the $700,000 it indisputably contributed to Rivers for unauthorized purposes:

> The substantial performance doctrine provides that where a contract is made for an agreed exchange of two performances, one of which is to be rendered first, substantial performance rather than exact, strict or literal performance by the first party of the terms of the contract is adequate to entitle the party to recover on it.  The intent of the doctrine is equitable: to prevent unjust enrichment or the inequity of one party's getting the benefit of performance, albeit not strictly in accord with the contract's terms, with no obligation in return.  The courts will allow recovery under the contract, less allowance for deviations, where a party in good faith has substantially performed its obligations.

*Brown-Mark Assocs., Ltd. v. Emigrant Sav. Bank*, 703 F.2d 1361, 1367 (11th Cir. 1983).

Alabama law establishes that ECR's act of diverting $63,392 of funds designated only for Phase 3 development and marketing is not a material breach.  *See Stockton v. CKPD Dev. Co.*, 936 So. 2d 1065 (Ala. 2005); *Exposition Enters., Inc. v. Double C. Prods., Inc.*, 439 So. 2d 52 (Ala. 1983); *see also Bruner v. Hines*, 324 So. 2d 265 (Ala. 1975) (holding buyer substantially performed in procuring slightly inaccurate survey for parcel of land because survey was incidental to main purpose of contract and was within acceptable limits of surveying profession).  In *Stockton*, the most relevant case, the lessors claimed the lessees materially breached the lease by failing to pay late fee penalties on four late rental payments.  936 So. 2d at 1077.  At the time the lessors asserted their claim, the lessees owed $1,300 in late fees but had paid approximately $300,000 in rental payments over a four year period–the lessees thus owed less than one percent of the rental payments they had made to the lessor.  *Id.* at 1078.  The court held that, *as a matter of law*, the lessees did not materially breach by

15

failing to pay the late penalties. *Id.* In the case before the Court, ECR's $63,392 spent for an unauthorized purpose is a little over one percent of the $500,000 funds it indisputably spent for authorized purposes and less than one percent of the $700,000 it indisputably contributed to Rivers in accordance with its contractual obligations. Thus, ECR's breach no more touched the "fundamental purposes of the contract" than the lessees' breach in *Stockton*.

By contrast, the court in *Exposition Enterprises* found a material breach as a matter of law where the buyer breached five contract terms related to the sale of a sport and boat show. 439 So. 2d at 54. The buyer, among other things, did not make the first of three installment payments, failed to make a $500 expense payment, and obtained only $300,000 of liability insurance as opposed to the required $500,000. *Id.* The contract also stated explicitly that the buyer would be in default of the contract for failure to make payments. *Id.* at 53. The court held that "the evidence of contract breach, when construed in light of the clearly expressed intentions of the contracting parties related to default, went to the essence of the contract, and thereby eliminated any factual question relating to materiality of breach." *Id*. at 55. Unlike *Exposition Enterprises*, the Operating Agreement in this case does not put ECR in default for failing to make required contributions to Phase 3 development and marketing. Rather, the Operating Agreement gives Camden the opportunity to make a Phase 3 payment and to adjust its percentage interest in Rivers accordingly. (Doc. #20-1, at 10–11.) Further, the number of breaches committed by ECR and the amount of financial damages are substantially less than those of the buyer in *Exposition Enterprises*.

16

In conclusion, Camden has failed to create a genuine dispute of fact concerning whether ECR materially breached the Operating Agreement by refusing to pay $12,500 without receiving invoices proving ECR was obligated to pay, and in diverting $63,392 of its $700,000 initial contribution to non-Phase 3 expenses.  As in *Stockton*, the Court finds that ECR's breach was not material as a matter of law.  *See also Norfolk S. Ry. Co. v. Basell USA, Inc.*, 512 F.3d 86, 93 (3d Cir. 2008) ("[I]n certain situations, it can be appropriate to determine the issue of material breach at the summary judgment stage.") (footnote omitted); *Teragram Corp. v. Marketwatch.com, Inc.*, 444 F.3d 1, 11 (1st Cir. 2006) ("As is true of virtually any factual question, if the materiality question in a given case admits of only one reasonable answer (because the evidence on the point is either undisputed or sufficiently lopsided), then the court must intervene and address what is ordinarily a factual question as a matter of law.") (quoting *Gibson v. City of Cranston*, 37 F.3d 731 (1st Cir. 1994)).

### 2.    Waiver

Camden also argues that there is a genuine dispute of fact about whether ECR waived Camden's obligation to transfer the property to Rivers shortly after ECR made its initial cash contribution by acquiescing in Camden's nonperformance.  Waiver is the voluntary surrender of a known right and must be manifested in some unequivocal manner, whether expressly or by conduct clearly evincing the intention to surrender.  *See Ex parte Textron*, 67 So. 3d 61, 66 (Ala. 2011) (citing *Isom v. Johnson*, 87 So. 543, 545 (Ala. 1920)).  "A waiver will not be implied from slight circumstances, but must be evidenced by an unequivocal and decisive act, clearly proved."  *Id.* (internal quotation omitted).  While the defense of waiver is

17

ordinarily a question of fact, a court may determine the issue of waiver if only one reasonable inference can be drawn from the evidence. *See McMillan Ltd. v. Warrior Drilling & Eng'g Co.*, 512 So. 2d 14, 38 (Ala. 1986).

Camden provides specific instances where ECR purportedly waived its right to timely transfer of property by Camden. First, Camden points to an e-mail from Coats to Sentman sent two days before the execution of the Operating Agreement in which Coats states that ECR "will need a phase 3 Deed and the executed operating agreement prior transferring [sic] cash tomorrow." (Doc. #20-4, Ex. D.) Camden argues that since ECR subsequently transferred the cash without having received a deed from Camden, ECR manifested an intent to waive "the temporal aspect" of Camden's performance. (Doc. #21, at 11.) This argument fails to raise a triable issue of fact on Camden's defense of waiver for two reasons. First, if anything, the e-mail from Coats establishes that receiving the property from Camden at or near the time of the execution of the Operating Agreement was important to ECR. Second, even if Coats's e-mail tended to prove the contrary, which it does not, the e-mail is inadmissible parol evidence. Parol evidence is inadmissible where a written contract is intended to be the complete agreement between the parties. *See First Commercial Bank v. Spivey*, 694 So. 2d 1316, 1327 (Ala. 1997) (citation omitted). "The parties can express their intention that a written contract serves as their complete agreement by including a merger clause in the written contract." *Prince v. Poole*, 935 So. 2d 431, 444 (Ala. 2006). The Operating Agreement contains a merger clause stating that the written agreement "contains the entire agreement between the parties hereto with respect to the subject matter thereof."

18

(Doc. #20-1, at 28.)  Further, the Operating Agreement unambiguously establishes that "*At the time* [ECR] *transfers the foregoing cash* . . . Camden shall contribute to [Rivers] the Lots in Phase 3, and all of the Amenity Areas and pocket parts . . . ."  (Doc. #20-1, at 8.)  The Operating Agreement clearly required ECR to transfer $700,000 to Rivers first, and then required Camden to transfer the property to Rivers shortly thereafter.  What Coats might have intended in an e-mail two days before the Operating Agreement was signed is inadmissible parol evidence, and the order of performance is clearly established in the written agreement. *See Southland Quality Homes, Inc. v. Williams*, 781 So. 2d 949, 953 (Ala. 2000) ("If a contract is unambiguous on its face, there is no room for construction and it must be enforced as written.").

Camden next "point[s] to the absence of any evidence indicating ECR's concern over the delay in conveying the deed after the execution of the Operating Agreement . . . ."  (Doc. #21, at 11.)  There is no "absence of evidence" on ECR's concern over the delay.  In fact, the record shows that ECR expected the transfer of property from Camden soon after execution of the Operating Agreement and that ECR specifically requested Camden to transfer the property.  The day after the Operating Agreement was executed, Gaither (counsel for Rivers) sent an e-mail to Sentman (representative for Camden) asking Sentman to send Gaithers necessary information for Gaithers to include in a draft of a deed transferring the property from Camden to Rivers.  (Doc. #26-3, Ex. C, at 3; Doc. #37-1, Ex. A, at ¶ 5.)  Sentman supplied the missing information to Gaither in an e-mail a few weeks later and indicated that he, rather than Gaither, would prepare the deed transferring the property from Camden to

19

Rivers.[3]  (Doc. #26, Ex. C, at 5–6; Doc. #26-13, Ex. M, at ¶ 4.)  After several more weeks passed, Gaither prepared a deed himself and forwarded it to Sentman.  (Doc. #37-1, Ex. A, at ¶ 6; Doc. #26-3, Ex. C, at 7.)  Camden failed to return the executed deed.  Again, in 2011, when the Alabama Department of Transportation refused to approve accel/decel lanes for Rivers, Coats e-mailed Sentman and stated, "I really need to talk with you about the deed from Camden to Rivers Reach and the ALDOT Bond and application."  (Doc. #26-2, at 2.)  Sentman responded the same day with the reply, "Already in the works."  (Doc. #26-2, at 2.)  Thus, ECR attempted to get a transfer deed from Camden in the days and weeks following the execution of the Operating Agreement and again directly requested the transfer deed in 2011 when it was a matter of critical importance for approval of the accel/decel lanes.  Further, on both occasions Sentman indicated that Camden was working on a transfer deed.  For Camden to now argue that ECR's lack of further insistence that Camden transfer the property is evidence of a waiver when Camden's own representative stated to ECR that a transfer deed was "in the works" is preposterous.

──────────────

[3] Given that Sentman stated "New transfer deed to follow" in his e-mail to Gaither dated December 2, 2010, (Doc. #26-3, Ex. 3, at 5), it defies belief that Sentman could state in his affidavit that "During the nine (9) months between the execution of the Operating Agreement [on November 17, 2010] and August 2011, I do not recall there being any request to deed the property into River Reach."  (Doc. #25, at ¶ 13.)  Gaithers's e-mail to Sentman asking Sentman to supply him with necessary information with a draft deed was an implicit "request" to deed the property to Rivers. For Sentman to respond two weeks after the execution of the Operating Agreement with the words "New transfer deed to follow" clearly indicates he understood ECR was requesting the deed transferring the property from Camden to Rivers.  While the Court does not make a credibility determination at this time, the Court cautions that it will address the possibility of perjury in Sentman's affidavit at a future date, if needed.  The Court also reminds the parties of their obligations under *Federal Rule of Civil Procedure* 11(b) and *Alabama Rule of Professional Conduct* 3.3(a) in connection with making false statements to a court.

Finally, Camden argues that ECR waived its right to timely performance because it "never exercised any right under the Operating Agreement or under the Alabama Limited Liability Company Law" until it filed the current lawsuit. (Doc. #21, at 11.) Camden's argument seems to be that ECR waived its right to timely performance, even though it insisted on such performance, because ECR did not actually *sue* Camden until two years after the execution of the Operating Agreement. A delay in bringing a lawsuit is not a voluntary waiver of a known right. It is well established that "following a material breach by the other party, the injured party may elect to continue the contract and retain its economic benefits." *Edwards v. Allied Home Mortg. Capital Corp.*, 962 So. 2d 194, 207 (Ala. 2007). This principle of contract law would be meaningless if a delay in bringing suit constituted a waiver of the other party's nonperformance.[4] In conclusion, Camden has failed to show there is a genuine dispute concerning whether ECR waived its right to timely performance by Camden. *See Allen v. Storie*, 579 So. 2d 1316 (Ala. 1991) (upholding grant of summary judgment to plaintiff on breach of contract because defendant failed to demonstrate genuine dispute of fact on waiver defense).

### 3.    ECR's Standing

Another argument Camden makes is that ECR has no standing to bring its breach of

---

[4] The Court notes that Camden also argues that there is a genuine dispute as to whether ECR has incurred damages from Camden's breach of contract, which is a necessary element for a breach of contract. (Doc. #21, at 13–15.) That is to say, Camden argues that a transaction in which P contributes $700,000 for a 50% interest in a joint venture in exchange for D's contribution of real property for a 50% interest in the joint venture, and in which P performs and D does not, *results in no economic harm to P*. While the Court acknowledges this display of zealous advocacy, this line of "reasoning" proves only that not every argument that can be made should be made.

contract against Camden because: (1) ECR must bring its claim as a derivative suit against Camden on behalf of Rivers; and (2) the change of all of ECR's membership since the execution of the Operating Agreement makes ECR no longer a proper party to the suit. (Doc. #49, at 20–23.)  The Court finds that both of these arguments are without merit.

### a.    ECR's suit is a direct action against Camden

ECR is entitled to sue Camden directly for breach of contract because ECR alleges Camden committed a direct harm against ECR independently of ECR's status as a shareholder in Rivers.  Under Alabama law, "[i]t is well settled that when individual damages sought to be recovered by a plaintiff are incidental to his or her status as a stockholder in a corporation, the claim is a derivative one and must be brought on behalf of the corporation." *Altrust Fin. Servs., Inc. v. Adams*, 76 So. 3d 228, 241 (Ala. 2011).  As the Alabama Supreme Court has said:

> "[T]he primary difference between derivative and individual claims is one of standing, and standing is determined by the directness of the injury.  If the wrong directly damages the corporation and its assets from waste, conversion and intentional mismanagement, the claim is the corporation's.  A consequential decrease in the value of the shareholder's shares does not vest in him an individual claim.  But if the wrong is committed directly against the shareholder and his interests, such as oppression or fraud, so that his injury is unique, he will have standing to assert individual claims.

*Id.*  In analyzing whether a claim is derivative or direct, a court looks to the nature of the alleged wrong rather than the designation used by the plaintiff in the complaint.  *Id.* at 238.

The Court finds that the nature of the wrongs alleged by ECR are for harms directly

22

inflicted against ECR by Camden.  ECR does not allege merely that Camden diminished the value of its shares through fraud or mismanagement of Rivers.  Rather, ECR alleges that Camden induced ECR to enter into the Operating Agreement with the promise of transferring the properties in exchange for $700,000, but that Camden had no intention of transferring the properties.  ECR further alleges that Camden intentionally failed to perform its obligations under the Operating Agreement because it conspired with Bond Safeguard to use the $700,000 acquired from ECR to reduce Bond Safeguard's bond liability for various phases of the Rivers development.  (Doc. #1-1, at ¶ 25.)  Although the Court considers only ECR's claim for breach of contract for purposes of summary judgment, the Court considers ECR's complaint as a whole, including its fraud claims, in determining whether the breach of contract action is direct or derivative.  The complaint makes clear that ECR claims it was induced to enter into the Operating Agreement on the basis of Camden's false representations that it would transfer the property into Rivers–representations that Camden had no intention of performing.  (Doc. #1-1, at ¶¶ 25, 30–31.)

Further, ECR seeks rescission of the contract and restitution, or, alternatively, expectation damages, rather than specific performance by Camden.  (Doc. #1-1, at ¶ 28.)  Thus, the "nature of the alleged wrong," as ECR sees it, is that it *entered into the Operating Agreement at all*–not that Camden's nonperformance is harming the value of its shares.  *See Altrust*, 76 So. 3d at 238.  The damages ECR seeks are not "incidental to [its] status as a shareholder," because it does not seek enforcement of the Operating Agreement to benefit Rivers by requiring Camden to transfer the property to Rivers.  *Id.* at 246.

In *DGB, LLC v. Hinds*, the Alabama Supreme Court held that a plaintiff LLC had standing to sue in a direct action against another LLC (among other defendants) with which the plaintiff had entered into a joint venture. 55 So. 3d 218, 229 (Ala. 2010). DGB entered into an agreement with several defendants to form a joint venture, Bon Harbor, LLC. *Id*. at 221–22. The DGB plaintiffs alleged that several defendant members of Bon Harbor fraudulently concealed that they purchased property on behalf of Bon Harbor for $10,000,000 that had been purchased just days earlier for $5,000,000. *Id*. This fraudulent concealment led DGB members to personally guarantee $7,500,000 of the loan used to purchase the property. The court held that DGB and its members had standing to sue the defendants directly, rather than derivatively on behalf of Bon Harbor. *Id.* at 229. This was because the defendants had "made representations directly to and concealed information directly from" the plaintiffs and thus they had "alleged injury to themselves individually." *Id*. Similarly, ECR claims that Camden "made representations directly to and concealed information directly" from it by promising to convey property to the joint venture whereas its real purpose was allegedly to reduce Bond Safeguard's bond liability, and that Camden's breach of the Operating Agreement thus harmed ECR individually. Therefore, because ECR claims it was directly harmed by Camden's breach of the Operating Agreement, ECR has standing to sue directly and does not need to sue derivatively on behalf of Rivers.

### b.  ECR's change in composition and standing

Camden argues finally that ECR has no standing to sue Camden for breach of contract because the membership of ECR has entirely changed from the time ECR entered into the

Operating Agreement until the time ECR brought suit.  (Doc. #49, at 21–23.)  In support of
its argument, Camden claims that ECR breached provisions of the Operating Agreement
prohibiting members from assigning their interest in Rivers.   Camden entirely
misunderstands the nature of standing and does not cite a single state or federal case to
support the proposition that a change in an LLC's membership deprives it of standing to
enforce a contract it entered into earlier.  The Court is confident no such case exists because
the corporate form would be of no value if changes in an LLC's composition resulted in a
change of its nature, such that it no longer constituted the original party to the contract.  *See*
1 Treatise on the Law of Corporations § 7:1 ("To speak of a corporation as 'a legal person'
is a convenient figure of speech used to describe the corporation as a legal unit, a separate
concern with a capacity, like a person's, to hold property and make contracts, to sue and be
sued, and to continue to exist notwithstanding changes of its shareholders or members.").

ECR has demonstrated that there is no genuine dispute of fact as to its performance
under the contract and Camden's breach, and that it is entitled to judgment as a matter of law.
Camden has failed to provide evidence that there is a genuine dispute of fact as to ECR's lack
of substantial performance and Camden's defense of waiver.  Camden has also failed to show
that ECR is not entitled to sue it directly or that ECR lacks standing due to its change in
membership.  Therefore, summary judgment is GRANTED in favor of ECR on its breach of
contract claim, and Camden's motion for summary judgment on ECR's breach of contract
claim against it is DENIED.  The Court does not dismiss Camden's counterclaim for breach
of contract because no party has moved for summary judgment on this counterclaim.  But the

Court has ruled that Camden materially breached the Operating Agreement and ECR substantially performed its obligations.  Whether ECR's immaterial breaches should offset any recovery it might have from Camden will be resolved at a later date.

## B.   Bond Safeguard's Motion for Summary Judgment on ECR's Breach of Contract Claim

Bond Safeguard has moved for summary judgment on ECR's breach of contract claim on the grounds that ECR's claims are solely against Camden.  (Doc. #49.)  It is undisputed that only ECR and Camden were parties to the Operating Agreement.  But in its complaint, ECR alleges that Camden and Bond Safeguard "are related and controlled by the same persons," or, alternately, that "Camden is an alter ego of Bond Safeguard Insurance Company."  (Doc. #1-1, at ¶ 24.)

Bond Safeguard has submitted evidence demonstrating that it is not a subsidiary of Camden, that it does not own any Camden stock, and that Bond Safeguard has never provided any financing to Camden.  (Doc. #50-1.)  *See Duff v. S. Ry. Co.*, 496 So. 2d 760, 762–63 (Ala. 1986) (listing factors for determining whether one corporation is a subsidiary or instrumentality of another).  Rather than maintain its alter ego argument, ECR in its response brief argues that both Camden and Bond Safeguard are alter egos of a third entity, namely Lexon Surety Group, Surety Acquisition Corp., Exchange Corp., J.A. Pattco, Inc., or the James Patterson Revocable Trust.  (Doc. #56, at 6.)  The Court deems ECR's claim in its complaint that Camden is an alter ego of Bond Safeguard to be abandoned.  *See Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is

26

upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.") (citations omitted).  Rather than respond to Bond Safeguard's argument, ECR seeks leave to amend its complaint to add the proper defendant, although it does not specify which of the above entities is the proper defendant.[5] (Doc. #56, at 6.)  The Court will reserve ruling on ECR's motion for leave to file an amended complaint and Bond Safeguard's motion for summary judgment until after the resolution of the discovery dispute currently pending before the Magistrate Judge.  (Docs. #34, 39.)

## V. CONCLUSION

For the reasons stated above, it is hereby ORDERED as follows:

1.      ECR's Motion for Summary Judgment (Doc. #16) on its breach of contract claim as contained in Count I of its complaint is GRANTED, and

2.      Camden's Motion for Summary Judgment (Doc. #48) on ECR's breach of contract claim is DENIED.

3.      The Court reserves ruling on ECR's Motion for Leave to File an Amended Complaint (construing Doc. #56 as containing a motion for leave to file an amended complaint) and Bond Safeguard's Motion for Summary Judgment (Doc. #48).

DONE this the day of 24th February, 2014.

/s/      Mark E. Fuller

---

[5] Defendants argue that ECR's "third party" alter ego theory is an impermissible attempt to amend its complaint through argument at summary judgment.  *See Gilmour v. Gates, McDonald & Co.*, 382 F.3d 1312, 1314–15 (11th Cir. 2004).  However, the Court finds that ECR has followed the "proper procedure . . . to assert a new claim," which is to seek leave "to amend the complaint in accordance with Fed. R. Civ. P. 15(a)."  *Id*.

UNITED STATES DISTRICT COURT